78 313
88 1049

𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

HUGHES v. TABB AND ALS.

Absent, *Richardson, J.*

January 24th, 1884.

1. TRUSTS—*Defined—General—Application of purchase money.*—The rule is that whenever the trust is of a defined and limited nature, the purchaser must himself see that the purchase money is applied to the proper discharge of the trust; but, whenever the trust is general and of an uncertain nature, he need not see to it. *Pattie* v. *Gardner,* 12 Wheaton, 498.

2. IDEM—*Idem—Discretion.*—Even when the object of the trust is defined, but the purchase money is to be reinvested upon trusts requiring time and discretion, purchaser is not bound to see to the application thereof. If any shall suffer by trustee's misconduct, it should be those who clothed him with the discretion.

3. IDEM—*Sale and reinvestment.*—When sale is made under power to sell and reinvest upon same trusts, it has been held that the purchaser is not bound to see to application of purchase money. And it is unreasonable that he should be so bound, if the form of the bequest implies confidence reposed in trustee as to applying the purchase money.

4. IDEM—*Infant, or unborn c. q ts.*—When the time has arrived for sale of real estate and the persons entitled to the money are infants, or unborn, the purchaser is not bound to see to the application of the purchase money. But otherwise, if the money is payable to an infant *at his majority.* In the latter case the person and the time are designated, and the trust is defined and limited.

5.. IDEM—*Payments from year to year.*—Where money is payable to persons yet unborn, and from year to year, to require purchaser to see, at his peril, that it is paid to the proper persons *in esse,* or to be born, and entitled during each one's lifetime, and to continue such supervision until all are dead who are so entitled, would be to defeat the sale and the purposes of the will. Such obligations would practically convert a purchaser into a trustee, and that, too, without compensation.

VOL. LXXVIII—40

6. TRUSTS—*Power of sale free of encumbrance—Case at bar.*—Testator charged estate bequeathed to his son J with payment of annuity of $3,000 out of the annual profits thereof to his son P, during his life, and at his death to P's child, or children, during their lives, or the life of the survivor. Testator also empowered J to sell and convey any of his real estate. P had only one child, E. J paid the annuity up to January 1st, 1871. But the slave and much of the other personalty was lost by the war, and the realty became less remunerative; and in order to enable him to continue paying the annuity, it became necessary for him to sell "White Marsh," part of the real estate. So J sold it to H for $60,000. In a suit to which P and his child (E) were parties, the court sanctioned the sale, allowed J to collect the cash payment of $20,000 for his own uses; required H to execute his bonds for the balance ($40,000), which bore interest at 7½ per cent. per annum, and was payable at three years, to a commissioner, and to execute a trust deed on "White Marsh" to secure payment of said bond; and directed H to pay the interest annually to P in satisfaction of the annuity, until the maturity of the bond, and then to pay the $40,000 into bank subject to the order of the court. For several years H regularly paid the annuity to P, and the arrangements seemed complete, and J so considering them, sold and conveyed the residue of the real estate to H. In 1873 H became insolvent. In 1875 H conveyed his equity redemption in "White Marsh" and the residue of the real estate, except the courthouse property, to trustees for the benefit of his wife (Mrs. H), and executed on the courthouse property a mortgage to secure £20,000 to B. The mortgage was foreclosed and Mrs. H purchased the property. H failing to pay the $40,000 into bank, "White Marsh" was sold under decree of the court for $34,151 net, to Mrs P, a sum insufficient to raise at 6 per cent. per annum the annuity of $3,000. Then P and his child (E) filed their bill to subject the rest of the testator's real estate to payment of the deficiency of the annuity.

HELD:

1. The sale of White Marsh to H was duly authorized and is valid.

2. The responsibility of H ceased upon a compliance with his contract; yet never having paid the whole of the purchase money of White Marsh, he is liable for the balance, and the decree against him therefor is proper.

3. But the arrangements made by the court to secure the payment of the annuity to P and his child after his death, exonerated the residue of the testator's real estate from the charge therefor, and that residue is not liable for the deficiency of the annuity, which the net proceeds of the sale of White Marsh under the deed of trust taken by the court and enforced by its decree are insufficient to pay. *Downman* v. *Rust*, 6 Ran. 587, reviewed and distinguished from the case at bar.

Appeal of Annie F. Hughes, wife of George Hughes, and Peyton N. Page, trustee for her, to several decrees of circuit court of Gloucester county, rendered on the 21st November, 1877, on 9th July, 1880, and on 23d and 24th May, 1881, respectively, in the causes of J. Prosser Tabb, executor of John Tabb, deceased, against George Hughes, Philip Tabb; Elvira Mary Tabb, his infant child, and als., and of Annie F. Hughes and Peyton N. Page, her trustee, against Tabb and als. The circuit court decided that the sale by J. Prosser Tabb, executor, &c., of White Marsh, part of the real estate of John Tabb, deceased, which had been charged with the payment of a certain annuity to Philip Tabb during his life, and after his death to his child, &c., was authorized and valid, but that the net proceeds of the resale of White Marsh being insufficient to raise and pay the annuity, the residue of the real estate of the decedent, which had also been sold to George Hughes, and by him conveyed to the trustee, Page, for the benefit of his wife, Mrs. Annie F. Page, was liable to supply the deficiency of said annuity. From this decree the appeal was obtained.

The opinion of Judge Lacy states the facts of the case in full and accurate detail.

*John S. Wise* and *H. R. Pollard,* for the appellants.

*Joseph Christian* and *Robert McCandlish,* for the appellees.

LACY, J., delivered the opinion of the court.

In the year 1860, John Tabb died in the county of Gloucester, possessed of a large estate, having first made his will, by which, after providing for his widow, who survived him only a few years, and making certain inconsiderable

specific devises and bequests, gives to his son, J. Prosser Tabb, and his heirs, the rest of his estate, subject to the following conditions, that is to say : " Three thousand dollars of the annual profits are to be paid annually, in half yearly payments, to my son, Philip Tabb, during his life, commencing six months after the death of his mother, and at his death the same shall be paid to or amongst his child or children during their lives or the life of the survivor of them."

The sixth clause of his will is as follows :

" I leave my son, John Prosser Tabb, my executor, knowing that the labor of managing the estate will be greater than my wife could undertake, and I hereby authorize and empower him to sell and convey any of my real property which may be to the interest of my estate. I request, as I owe no debts, that he be permitted to qualify without security, and that no inventory or appraisement of my household and kitchen furniture be taken except by the parties interested."

The estate of the testator, who died in the month of April, 1860, was large. He was the owner of the "White Marsh" tract of land of seventeen hundred acres, and all the land and buildings at Gloucester Courthouse, except the public buildings; a farm called "Somerville," adjoining the Courthouse; a valuable tract at Gloucester Point, and valuable real and leasehold property in the city of Norfolk. His slaves were appraised at $90,000, and his personal property was appraised in the aggregate at $153,184.52. The household and kitchen furniture was not appraised, by the direction of the will.

After the death of his wife, $5,000 was to go to J. Prosser Tabb's children for legacies. The legacy to Philip of certain bonds, worth $25,000, was accompanied by a gift of the same in life. His property in Norfolk was given to Philip, but if he should die without issue, it was to revert to his estate.

The late war began soon after the death of the testator, by which the slave property was lost to the estate, and much other valuable property destroyed.

In 1870, J. Prosser Tabb sold the White Marsh tract of land to one George Hughes, of New York city, at the sum of $60,000—$20,000 to be paid in cash, the balance of $40,000 to be secured by a lien on the White Marsh tract, bearing seven and one-half per cent. interest; the interest to be paid semi-annually, and the principal to be paid in three years.

This transaction had the cordial consent and approval of Philip Tabb, it being arranged among the parties that the interest was to go to Philip Tabb, by way of discharging his annuity of three thousand dollars a year. In November, 1870, the said J. Prosser Tabb and the infant child of Philip Tabb, by Tazewell Taylor, her next friend, filed their bill in the county court of Gloucester, against Philip Tabb and George Hughes, setting forth this sale and the arrangement above mentioned, as to the credit payment of $40,000; and the sanction of the court was had and the sale approved; a reference being first had to a commissioner in chancery, whose report was brought in and considered in the cause. J. Prosser Tabb was authorized to collect the $20,000, so far as uncollected, and a commissioner of the court appointed to collect the $40,000, when it should fall due, directing the interest to be semi-annually paid to Philip Tabb, as an equivalent for his annuity given him by his father's will, and further provided for a deed to be given to the purchaser, George Hughes, who was required to convey the White Marsh tract to a trustee to secure the payment of the $40,000, at the end of the three years, and for a time the arrangement seemed to be complete. Then J. Prosser Tabb sold the remaining lands of his father's estate to George Hughes, to-wit: Courthouse, the Glebe, and Gloucester Point lands.

With the financial crisis of 1873, came the failure of the firm of George Hughes & Co., of New York city, of which said Hughes was the senior member. On the 24th of September, 1875, George Hughes conveyed his equity of redemption in White Marsh, the Glebe, and Gloucester Point property, to P. N. Page and William Dickson, trustees for Annie F. Hughes, to be held by them for her benefit; and on the 2d of December, of the same year, he executed a mortgage on the Courthouse property to secure a debt of £20,000 sterling, to one George Bliss, of New York.

This mortgage was foreclosed by legal proceedings in the circuit court of Gloucester, when a special commissioner, appointed for the purpose, sold the same April 2d, 1877, to William Dickson, trustee for Annie F. Hughes, for $14,000, which was paid. Subsequently, a deed was executed to said trustee, and P. N. Page, the appellee, was substituted as trustee in the place of William Dickson.

In May, 1877, a decree was entered directing the sale of the White Marsh tract in the circuit court, the first named suit having been there removed, by the statute of 1873, from the county court; and the said bond of $40,000 being then due, and the interest not paid thereon for that year, and George Hughes having failed to deposit the sum of $40,000 in bank, as directed by the former decree in the cause, entered in November, 1876, on the 1st day of October, 1877, a special commissioner of the court sold the said White Marsh tract under said decree of May, 1877, and the wife of Philip Tabb became the purchaser, at the sum of $35,000. The expenses of the sale were $843, and the net proceeds $34,157. On the 21st of November following, without the execution of any bond and without security, the sale was confirmed, and the sheriff ordered to put Katherine V. Tabb, the wife of Philip Tabb, in possession as purchaser of the said White Marsh tract, which was done. The appellants in 1879 presented their petition to the circuit court of Gloucester, praying to

be admitted as parties defendants to the suit of Tabb's executor v. Hughes; that Katherine V. Tabb, the purchaser of the White Marsh tract, might be required to comply with the terms of sale; that the will of John Tabb might be construed; and should it be held that any charge existed on the real estate in favor of the annuitants under the will, that the reversionary interest of John Prosser Tabb in the $40,000 might be subjected.

The parties were summoned to answer this petition. In the year 1880 appellants came in with another petition, setting forth that the terms of sale were still uncomplied with, and setting forth moreover that the said Katherine V. Tabb, having failed to comply with and complete her purchase, was now denuding the White Marsh tract of timber, and asking an injunction, which was granted. On the 9th of July following the May term, 1880, when the above mentioned injunction was granted, a special term was held and the court then decided that the said Annie F. Hughes, the purchaser of the other lands of John Tabb, had no concern in the matter of compliance with the terms of sale of White Marsh by Katherine V. Tabb, nor with the cutting of timber off of the same, nor with subjecting the equity of redemption in the $40,000 belonging to J. Prosser Tabb, and dissolved the injunction awarded about a month before; by which, without compliance with the terms of sale, the timber on White Marsh might be cut by the purchaser. This seems to have been the effect of the decree, as the court decided that *Annie F. Hughes had no standing in court at that time.*

On the 22d of November following, Philip Tabb filed his answer to this petion of the appellees, upon which nothing was done at this term.

In the next year, the appellees came again into court with a petition setting out the transaction hereinbefore recited; the pretension of Philip Tabb, that all the lands

held by the appellees, which they bought at the sales hereinbefore mentioned, were bound for the annuity to him; that J. Prosser Tabb had used a large part of the $20,000 paid in cash by George Hughes for White Marsh tract, to buy, and now, held, a valuable tract of land in the county, called "Ditchley"; that if there was a trust estate created by the will of John Tabb, Ditchley was liable first to pay the annuity to Philip Tabb, and that the reversion of J. Prosser in the $40,000 was in like manner liable; that Katherine V. Tabb was still in possession of White Marsh, and had not complied with the terms of sale, but was cutting timber from the tract of land, which would seriously impair its value; that Philip Tabb might die at any time, and at a resale to satisfy the annuity to his children, a still greater deficiency might result; and praying a construction of the will of John Tabb, an injunction to restrain John Prosser Tabb from collecting rents from Ditchley, aliening or encumbering it; that the sale of the reversionary interest of John Prosser Tabb in the $40,000 might be set aside, which had been effected at a small sum to Katherine V. Tabb, and that Katherine V. Tabb and all others might be restrained from cutting timber from White Marsh. This injunction was granted, and Katherine and Philip Tabb answered, admitting the statement above as substantially true, and claiming that there is a charge upon the whole estate of John Tabb for the annuity to Philip Tabb; that the court had never exonerated any part of it except White Marsh, and that for the lands sold the appellants were liable, after deducting the net sales of White Marsh to Katherine V. Tabb; that Katherine V. Tabb had purchased the reversionary interest of J. Prosser Tabb in the $40,000, and there was no necessity for her to comply. J. Prosser Tabb answered also, and admitted that Ditchley was bought with the proceeds of White Marsh.

On the 23d of May, 1881, the two causes were heard to-

gether, upon the motion of Philip, Katherine, and J. Prosser Tabb, to dissolve the injunction awarded on the 3d of March, 1881, upon the bond of Katherine V. and Philip Tabb of $30,410, conditioned for the payment of the interest thereon, annually, to the said Philip Tabb during his lifetime in semi-annual payments, and after his death to his surviving child or children; and upon a statement showing the balance due from George Hughes on his bond of $40,000, after crediting the amount of the second purchase, less costs of sale, and the overdue annuity, as is stated above. In this decree, Katherine and Philip were directed to execute their joint bond to a commissioner in the penalty of $30,410, conditioned for the payment of the interest semi-annually, which is therein ascertained to be $912.30, half-yearly; and directed the said Katherine and Philip to convey the said farm in trust to a trustee named therein, to secure the payment of the said bond; the said commissioner to simultaneously convey by deed to the said Katherine; that the interest thereon should be in satisfaction *pro tanto* of the annuity of Philip, subject to which John Tabb devised the rest and residue of his estate to J. Prosser Tabb; and all such rest and residue of said estate so devised to said John Prosser Tabb, shall be relieved to the extent of such annual interest from the payment of the annual sum of three thousand dollars, subject to which it was devised.

The decree dissolved the injunction of March 3d, 1881, and held that $1,175.40 still remained to be annually paid out of the rent and residue of John Tabb's estate, which should be paid out of the annual profits of the residue of the said estate, held by the said John Prosser Tabb, and his *alienees, if any, subject to the condition that they pay the same out of the annual profits thereof*, to be paid out of such estate in the inverse order of its alienation; and a reference to a master was directed to enquire and make re-

port as to when and what real estate of John Tabb had been aliened and to whom, &c. The decree ascertained the net balance due from George Hughes, on his bond of $40,000, to be $9,590, and decreed against the said George Hughes the said sum, with interest from October 1st, 1877, at $7\frac{1}{2}$ per centum interest.

From this decree an appeal to this court was applied for, and allowed. As is insisted on both sides, there is but one question involved in this case in this court about which there is any serious contention, and upon which it is necessary to pass. That assignment is this :

"It was error to decree that the remainder of the annuity of $3,000 (after deducting therefrom the amount of the annual interest of $1,824.40) is to be paid out of the annual profits of the residue of the estate of said John Tabb, and that such residue of said estate is held by said J. Prosser Tabb and his alienees, if any, subject to the condition that they pay the same out of the annual profits thereof."

There are other and numerous assignments of error, but this is the question upon which it may be said all the others depend.

Did the will create a charge upon the real estate of John Tabb for the payment of the annuity to testator's son, Philip; and if so, was it so charged for such a purpose as to require the purchaser thereof to see to the faithful application of the purchase money *to the objects of the trust?*

In considering this question it will not be necessary to consider it in the aspect of collusion between the trustee and the vendee, as the case throughout, as we have reviewed it, shows on the part of J. Prosser Tabb the utmost good faith and fair dealing. Although authorized by the will to sell whenever he thought it best for the interests of the estate, he convenes his first purchaser and the brother and his child, who are entitled to the annuity, in a

court of equity, asks the assistance of the court in the premises, and obtains the leave of the court, and the consent of his brother, the annuitant, to his receiving $20,000 of the purchase money for his own uses, among which chiefly, no doubt, was to pay the over-due annuity. The remaining purchase money, $40,000, was invested by bond to run three years, interest payable semi-annually, at a rate which made the annuity; secured this bond by a trust deed upon this $60,000 tract of land, which was held by the court to be a safe investment and fully to provide for the annuity. The $40,000 was made payable to the court in effect, and by the consent and hearty co-operation of everybody in interest the problem of the will seemed solved.

J. Prosser Tabb then seemed at liberty to exercise the large powers granted him by his father's will, without endangering the interests of his brother and his children, as they seemed now secured. So, having suffered such material loss by the disasters of the late war, and being possessed of so large an estate in amount, and almost without income, he sold the other property in question for $46,420 nominally, which was an exchange for New York city property, with a rental of $15,000 a year. This was doubtless the circumstance which led to the exchange. This property in New York was taken subject to a lien already subsisting thereon. And before long, this ill-fated and unfortunate executor was destined to encounter a financial crisis which well-nigh completed the ruin as to the estate of John Tabb, which the effects of the war had so effectually commenced.

The crisis of 1873 brought a fall of values, by which the New York city property, with its subsisting creditors' lien, was lost, and next compassed the ruin of the large and wealthy house of George Hughes & Co., importers of linen goods, &c. George Hughes failed, could not pay his $40,000 bond for the purchase of White Marsh, and the

White Marsh tract was sold by order of court and bought by Katherine V. Tabb, the wife of the annuitant, and, as we have seen, fell short of the $40,000. When called upon to know what was done with the $20,000, J. Prosser Tabb frankly admits that he had invested $10,000 of it in the valuable Ditchley tract, which he still holds, and that he had sold his reversionary interest in the $40,000 to his brother for $2,500. Not only was there no bad faith on the part of J. Prosser Tabb, and not only did Hughes have no cause to suspect bad faith in his vendor, but he had positive knowledge when he bought the Courthouse and other property that every act of J. Prosser Tabb was not only open and fair and *bona fide,* but that it had the assent of the annuitant, and, what is far more to the purpose, that it had the approval of a court of competent jurisdiction.

This purchaser then stands in the attitude of purchasing for value, at a *bona fide* sale by J. Prosser Tabb, with notice of all the trusts under the will of John Tabb, and with notice, at the same time, of the just and ample provision made for the protection of the trust and the maintenance of its purposes. Everything was in superlatively good faith. But the failure of George Hughes caused default in the payment of his bonds. The court has subjected the security provided, as we have seen, for its payment, and rendered a decree against George Hughes for the deficiency ; and from this part of the decree no appeal is granted, and George Hughes, and whatever property he may have, is subject to its payment.

But all the property of George Hughes having been sold, the contention here is, that the will of John Tabb made his son, John Prosser, a trustee, and devised his lands in trust to be held, subject to a lien for $3,000 a year, for the bene-fit of his son, Philip, and his children ; and that this trust is of such a character that the purchaser of this real estate must see to the application of the purchase money *to the purposes of the trust.*

That is, that when John Prosser sold any of this land, the purchaser was bound, at his peril, to see that he applied the proceeds as the will directed, so that the purposes of the will shall be effectuated and not defeated.

We have seen the will of John Tabb above. We will consider briefly the law of the subject; and it may be remarked that the learned counsel on each side have not disputed concerning the principles of law involved, citing for the same purposes the same authors, but differing only in their application of the legal principles admitted to the circumstances of this case. The rule is, that wherever the trust is of a defined and limited nature, the purchaser must himself see that the purchase money is applied to the proper discharge of the trust; but wherever the trust is general, and of an unlimited nature, he need not see to it. 2 Story's Eq. Jur. § 1131; 1 Lom. Dig. 302–4; *Potter* v. *Gardner*, 12 Wheaton, 498.

There is much reason in the doctrine that where the trust is defined in its object, and the purchase money is to be reinvested upon trusts which require time and discretion, or the acts of sale and reinvestment are manifestly contemplated to be at a distance from each other, the purchaser shall not be bound to look to the application of the purchase money, for the trustee is clothed with a discretion in the management of the trust fund, and if any persons are to suffer by his misconduct, it should rather be those who reposed confidence than those who have bought under an apparently authorized act. Opinion of Justice Story in *Wormley* v. *Wormley,* 8 Wheaton, 442; Sugden on Vendors, ch. 11, § 1. So, when a sale is made by trustees under a power to sell and reinvest upon the same trusts, it has been held in America that the purchaser is not bound to see to the application of the purchase money. 2 Story's Equity, § 1134, and authorities there cited.

If the form of the bequest implies a confidence reposed

in the trustee in regard to the application of the purchase money, in all such cases it is unreasonable to require the purchaser to look to the application of the purchase money ; and this is a principle which will ultimately mark an intelligible distinction among the cases in regard to the question. Id. When *the time has arrived* for the sale of the real estate, and the persons entitled to the money are infants or unborn, then the purchaser is not bound to see to the application of the purchase money, because he might thus be implicated by a trust of long duration. 13 Pick. 392 ; 5 Ired. Eq. 357 ; 10 Penn. St. 267. But if an estate is charged with a sum of money, payable to an infant at his majority, then the purchaser is bound to see the money duly paid ; there the person is named, is in *esse,* and the day is fixed and designated, the trust is defined and limited.

While if a sum of money is to be paid to persons yet unborn, and from year to year, to require the purchaser to see to it, at his personal peril, that the said sum of money is paid to the proper person or persons *in esse* and that may be hereafter born, and be entitled during the lifetime of each and all, until all are dead, would be to defeat the sale in such a case altogether, and defeat the purposes of the will.

What purchaser would buy land if he had to guard the safety of the investment of the proceeds, for it might be a hundred years, when he, and possibly his children, should be dead? And if he did so buy, and such were his duties, it would be practically to substitute him to the duties, cares and responsibility of the trustee, and that without compensation. These are some of the most important and nice distinctions which have been adopted by courts of equity upon this interesting topic; and, as a distinguished author has observed, they lead strongly to the conclusion to which eminent jurists and also eminent judges have arrived, that it would have been far better to

have held in all cases that the party having the right to sell had also the right to receive the purchase money, without any further responsibility on the part of the purchaser as to its application. 2 Story's Eq. § 1135. See *Potter* v. *Gardner*, 12 Wheaton, 498.

The appellees cite and rely on the case of *Downman* v. *Rust*, 6 Rand. 587. In that case the testatrix bequeathed two legacies of $400 and $200, respectively, to two persons. The residue of her estate to Benjamin Rust, and appointed him her executor. Her personal estate did not amount to one hundred dollars, so it was held that the legacies were a charge upon the real estate. Rust conveyed to a trustee to secure the payment of his own debt; at the sale under the trust deed the creditor of Rust purchased, and the legatees gave him and the trustee notice of their claim to have their legacies satisfied out of the land. Their claim was sustained.

If the transactions of Rust had been sustained, he would have alienated the whole estate to pay his own debts, and repudiated all the claims under the will, while the testatrix had not bequeathed the whole estate to him, but provided for the payment of two sums of money, to be paid *at once*, and to *designated persons*. His own creditor was dealing with him with the full knowledge that he was misapplying the trust estate, and had actually co-operated in the breach of trust. We may make a brief application of these principles to the case in hand.

John Tabb charged the estate which he gave his son, J. Prosser, with the payment of an annuity to his son, Philip, to continue during Philip's life, and during the life of the last child of Philip which should hereafter be in life. The estate was obviously charged in the hands of Prosser. The testator expressly declares that he shall take subject to the condition of paying this annuity out of the annual profits. With $153,184.52 of appraised personalty, $6,000

worth of unappraised personalty, and perhaps as much in realty, it may be that the testator considered this condition a very trivial one. But however that was, he added a proviso which we have seen: "I hereby authorize and empower him *to sell* and *convey* any of my real property which may be to the interest of my estate."

In this case the time to sell came by the imperative necessity of paying this annuity. The real estate could not be utilized under the changed circumstances of the country so as to pay the annuity, and yet Prosser could not hold it without raising the annuity. He had qualified without giving security, which, under the circumstances of the possible long duration of the trust, he might find it difficult to give. He was open to attack. He must sell for the purposes provided for in the will. He found a purchaser and went into court, as we have seen, to have the matter of securing and settling the annuity fixed.

We have seen the arrangement perfected by the court, and the fund secured in a manner which seemed ample in all respects. A trust deed was taken by the court upon valuable real estate, as to two-thirds only of the value of the same which it had just reached in the market; the fund was taken charge of by the court, and afterwards he sold the lands in question here.

1st. If the purchaser of the said lands was obliged to see to the application of the purchase money to the ends of the trust, the annuity appeared to be provided for, and in the hands of a court of chancery. Was there anything else he could have done, unless he were required to stand by, through all the years, and see that, in no event, the investments made by the court should ever fail, in any contingency which might arise? If so, as we have said, no reasonable man would part with his money to another and be responsible for all the investments, and yet have no power to control the investments. In this case the court

had taken charge of the fund, which was White Marsh, upon which, by authority of the court, the purchaser had paid $20,000 in money.

2d. Does this will create such a trust?

The annuity was to be paid, first to a person living, at his death to a surviving child, or children, if any. There was one child then, another has been born since. How many there will be, how long Philip Tabb may live, how long his child, or children, may survive him, and where they live, or where they may die, are questions no one can answer.

Under the authorities we have cited, could any person be expected to undertake such a duty, merely to pay value for property so encumbered? It would be to require the purchaser, in effect, to become the executor of John Tabb, without any of the residue of his estate or other compensation. It would doubtless have been far better for J. Prosser Tabb if he had declined this long trust.

J. Prosser Tabb was expressly authorized to sell at his discretion. The responsibility of Hughes ceased upon a compliance with his contract. He has never paid the whole of the purchase money for the White Marsh tract, and he is liable therefor, and the circuit court did not err in decreeing against him for such residue.

But the White Marsh tract has been sold, and all the other lands bought by George Hughes, to other persons, to pay his debts, and the circuit court has decided that these lands are liable for the unpaid portions of the annuity. In this the court erred.

And so much of the decrees of 23d and 24th of May, 1881, as so declares must be set aside and annulled. It is not necessary to pass upon any question concerning Ditchley, or any other question in the cause concerning the wood and timber on White Marsh, nor as to the properly securing of the fund for which White Marsh was sold, as

these are questions, in the view we have taken, with which the appellants have no further concern.

HINTON, J., dissented.

DECREES REVERSED IN PART.

ON THE REHEARING, April 3d, 1884, *Richardson*, J., *being present, and Lewis*, P., *being absent.*

*H. R. Pollard* and *J. B. Donovan* appeared for the appellants.

*L. R. Page* and *Christian & Christian*, for the appellees.

The will of John Tabb charged the annuity of $3,000, given to Phillip Tabb and his children, upon the whole of the estate given to J. Prosser Tabb.   It needs no argument or authority to prove that the annuity was charged on the estate, for the charge is created by express words.   See Perry on Trusts, §§ 568, 569, 570, 571.   As was said in the opinion on the former hearing : " The estate was obviously charged in the hands of Prosser.   The testator expressly declares that he shall take subject to the condition of paying this annuity out of the annual profits."   Indeed, instead of a mere charge, the will may be more properly construed as giving to Philllip Tabb and his children *specifically* $3,000 annually *of* the profits of the property devised and bequeathed to Prosser.

It is true the charge is upon the "profits."   But said Lord Tenterden in *Doe d. Goldin* v. *Lakeman*, 2 B. and A. (22 E. C. L. R.), 30 : "It is an established rule that a devise of rents and profits is a devise of the land "; and all the authorities are to the same effect.   See *Smith* v. *Dunwoody*, 19 Georgia, 237 ; *Den* v. *Danners*, 1 Spencer (N. J.), 142, 144; *Anderson·*

v. *Greble,* Ashmead, 136, 138 ; *Earl* v. *Grim,* 1 Johns. C. R. 494; *Drasadow* v. *Wilde,* 63 Pa. St. 190, 172 ; *France's Estate,* 75 Pa. St. 220, 223, 224; *Van Rennselaer* v. *Dunkin's Ex'or,* 24 Pa. St. 252. A gift of the profits of land in fee or for life or years is a gift of the land itself in fee or for life or years, and a charge upon the profits is a charge upon the lands in the same manner and to the same extent. *France's Appeal,* 75 Pa. St. *supra,* and the other cases cited *supra.*

Under the will of John Tabb, the charge of the annuity is coextensive with the gift to Prosser. All the estate given to Prosser is charged with the annuity ; and so long as any of it remains, the annuitants are entitled to resort to it for their annuity, and they cannot be deprived of their lien on any portion of the estate without their consent, any more than a creditor, holding several securities, can be deprived of any one of them without a full satisfaction of his debt. And so Phillip Tabb and his children having had a right, under the will of John Tabb, to charge the whole residuary estate given to Prosser, which included the three tracts, known as the " Courthouse," " Glebe," and " Gloucester Point" tracts, they are still entitled to resort thereto, unless their right to do so has been in some way released or divested. Has any such thing taken place ?

I. The suit brought to confirm the sale of " White Marsh," which is relied on by opposite counsel as effecting a release, was instituted for the purpose of giving a clear title to the purchaser of that tract. It relieved " White Marsh" alone, and no other property, of the annuity. On the contrary, the charge of the annuity on the remaining property was carefully and seduously retained throughout all the proceedings. In his bill J. Prosser Tabb said he *"only proposed"* that " White Marsh" should be exonerated from the charge of the annuity, *"leaving it unimpaired as to the other estate devised to your orator, and which is of itself*

*ample security for the said annuity."* This is an explicit statement in the bill at the very origin of the suit of "all that was proposed"; and all the subsequent proceedings must be read in the light of that statement in the bill. *Burging* v. *McDowell*, 30 Gratt. 242. Phillip Tabb in his answer is equally distinct. For in consenting to the sale of "White Marsh" by the court he expressly stipulates that it shall be "without prejudice to the annuity, which he insists is created by the will on the remaining lands of the testator devised to the plaintiff as additional security therefor." The commissioner to whom the cause was referred, in his report expressly recognized the continuing charge of the annuity on the remaining lands. And there is not a syllable in the decree that intimates or can be even tortured into a release of the remaining land, or a restriction of the annuitants for their annuity to the proceeds of "White Marsh," or rather to George Hughes' liability for such proceeds, which he afterwards so utterly failed to meet. It would indeed have been surprising if any court could have entered any such decree. For both J. Prosser Tabb and Phillip Tabb, recognizing that the $40,000 might fail to provide for the annuity, for the double reason that it might not be paid in full, or, if paid, might not be capable of being safely invested so as to yield permanently the extraordinary income of $3,000 a year—both of which things happened—had expressly stated that the annuitants were not to take the risk of either the $40,000 being paid, or of its realizing the said income of $3,000 a year, but that the charge of the annuity was to remain unimpaired upon the other lands as additional security therefor. Any decree, therefore, releasing such other lands would not only have been without the consent of the annuitants, but in the teeth of the express reservation of the charge by all parties, and would have been specially improper so far as the infant children of

Phillip Tabb are concerned, who are entitled to said an-
nuity after their father's death. But argument to show the
folly or impropriety of such release is needless, as the de-
cree does not contain a syllable that affects to release the
remaining lands, or to confine the annuitants to "White
Marsh" or its proceeds.

II. Were the "Courthouse," "Glebe," and "Gloucester
Point" tracts freed from the charge of the annuity by the
conveyance of those tracts made by J. P. Tabb and wife to
George Hughes on the 15th day of July, 1872?

On this point the court discusses at great length, in its
former opinion, the question of the obligation of a pur-
chaser to see to the application of purchase money; and we
do not question the soundness of any of the doctrines laid
down on that subject. But it seems to us, we say it with
all deference, that those doctrines do not control the de-
cision of this case. For in this case there was no sale and
no purchase money. The three tracts in Gloucester county
were exchanged with Hughes for the New York property.
And Hughes paid no purchase money to J. P. Tabb. We
shall hereafter attempt to show that that transaction was not
an execution of the power contained in John Tabb's will;
and, if intended as an execution, was a gross breach of trust
participated in by Hughes. But if that transaction was a
valid one, it is evident there is no room for the application
of the doctrines touching purchase money. For the ex-
change accomplished both the sale and the reinvestment, the
New York property taking the place of the Virginia prop-
erty; and the only question is, Whether that transaction
and that investment was a valid execution of the power?

On July 15th, 1872, when there was no occasion to sell
the property for any interest of the estate, and when the
annuity to Philip Tabb was being regularly paid by the
purchaser of "White Marsh," J. P. Tabb and wife, said
Tabb acting individually and not as executor, and not con-

veying pursuant to the power given by the will of John Tabb or anywhere referring to such power, conveyed the three tracts in Gloucester county to George Hughes. In making the said conveyance, J. P. Tabb was not acting in the interest of the estate or to meet any necessity of the estate, but in his own interest alone, and with a view by a desperate venture and a lucky stroke to better his own fortune; but even in this he was disappointed. For he received in exchange from Hughes, as the consideration for this conveyance of the Virginia lands, property in the city of New York heavily mortgaged; and in less than two years the New York property was sold under the encumbrances existing at the time of the exchange, and brought less than the encumbrances. And so J. P. Tabb parted with the Virginia tracts, and never received any value therefor. All of these facts appear in the record, are admitted by opposite counsel in their printed brief, are stated expressly by Mrs. Annie F. Hughes in her bill filed in this suit, and are referred to in the former opinion of this court.

It seems plain under the most elementary principles that such a transaction by an executor or trustee cannot be justified. It is one of the plainest duties of an executor or trustee to invest the trust property in such manner that it shall be safe. See 1 Perry on Trusts, §§ 452, 454. He cannot embark the trust estate in speculation, or put it in imminent peril of loss. The record shows that in this case J. P. Tabb, after parting with the three tracts in Gloucester county, had no property left belonging to the estate of any value under his control; and this Hughes knew as well as he did. And yet he took the New York property, subject to an overwhelming encumbrance, which could be foreclosed the next day, and the property sold at a forced sale and at a sacrifice. He had no means to redeem the mortgage or to protect the property from forced sale at any time the encum-

brancer might choose to make it, and he was also entirely without means to buy at such sale, or to bid up the property so as to prevent its sale at a sacrifice. This was to put the trust property in such manifest hazard and jeopardy as to constitute a gross breach of trust; and this was well known to Hughes. Dr. Tabb may have been deluded by the hope that the New York property would increase in value, and that he would make a good bargain; but this was a speculation on the value of the property. It would not have been so bad if the exchange had been made for unencumbered property; for then J. P. Tabb could have controlled the time of sale and waited for a good price; but by the transaction he entered into he placed the trust-estate at the mercy of others, who, at any time they chose, could sell him at out a sacrifice and destroy the whole trust-estate, against which action he had no means to protect himself. And so the event proved. For the property was sold for less than the liens on it, and J. P. Tabb, instead of receiving anything, had to pay personally a deficiency on the mortgages which he had assumed when he made the exchange. The transaction presents many elements of breach of trust.

1. The power given J. P. Tabb by the will of John Tabb was to "sell and convey," and under that power J. P. Tabb had no power to make an "exchange," much less such an exchange as this, involving the whole trust estate in the danger of almost certain loss. *Taylor* v. *Galloway*, 1 Ohio, 232; *City of Cleveland* v. *State Bank*, 16 Ohio St. 268; *Ringgold* v. *Ringgold*, 1 Har. & G. 11; *Waldron* v. *McComb*, 1 Hill 111; *Griffith* v. *Morrison*, 58 Tex. 46.

2. The power expressly authorized him to sell only "for the interest of the estate." It is elementary that the donee of a power cannot exercise it for his own interest or for any motive personal to himself. But in this case, when the exchange was made, there was no occasion for it or for the interest of the estate, and Hughes knew this.

3. It was a breach of trust in J. P. Tabb to undertake, without some controlling necessity, to invest the trust-estate in a foreign jurisdiction, subject to foreign laws and rules of property and remote from the beneficiaries. 1 Perry on Trusts (3d ed.), § 452, n. (1); *Ormiston* v. *Olcott*, 84 New York R. 339, 343–4.

4. If J. B. Tabb was intending to act in this transaction as executor, it was his clear duty to have taken the conveyance of the New York property to himself as executor, or indentified it in some way as for the benefit of his decedent's estate; but he took the conveyance from Hughes to himself individually, which was a breach of trust participated in by Hughes.

5. This court has repeatedly decided that a sale by an executor at a sacrifice, not demanded by the necessities of the estate, is a breach of trust in which the purchaser will be held to participate. See *Pinckard* v. *Woods*, 8 Gratt. 140; *Jones* v. *Clark*, 25 Gratt. 642; *Brockenbrough* v. *Turner*, 8 Va. L. J. 278.

If such a transaction is denounced as a breach of trust and the purchaser held to be implicated, how much more clearly was this ruinous exchange made by J. P. Tabb, which was not required by any necessity of the estate, and by which he destroyed the whole trust estate, a breach of trust, and how much more ought Hughes, who knew all the facts and circumstances surrounding the transaction as well as J. P. Tabb himself did, to be held to have participated in such breach of trust.

Nor can Annie F. Hughes claim to be a purchaser for value and without notice of such breach of trust. The record shows that she and her trustee had full knowledge of all the facts attending the transaction. In her bill filed in this suit she does not claim or pretend that she was a purchaser without notice. On the contrary, she sets out expressly in her bill the facts which constituted the breach

of trust without the slightest intimation that she was not fully apprized of them from the beginning to the end. And yet nothing is better settled than that one who claims the protection extended to a *bona fide* purchaser without notice, must aver that fact in express terms and prove it. 1 Perry on Trusts, § 219; Barton's Chan. Pr. 375; *Tompkins* v. *Mitchell*, 2 Rand. 428; *Downman* v. *Rust*, 6 Rand. 591.

And Annie F. Hughes, so far from doing this, has expressly averred in her bill the facts constituting the breach of trust. Indeed, the whole frame of her bill shows that its real object was to require the annuitants before coming on the lands in her hands to exhaust any property which J. P. Tabb owned. And in addition, the settlements on Annie F. Hughes were *post-nuptial* settlements, made by Hughes when he was heavily indebted, and they are, therefore, presumed to be voluntary and fraudulent. *Fink* v. *Denny*, 75 Va. R. 663; *Hatcher* v. *Crews*, 8 Va. L. J. 293.

III. But there is another view which is conclusive of this case, and that is that the deed of 15th July, 1872, from J. P. Tabb and wife to George Hughes was not made in execution of the power contained in John Tabb's will, and therefore conveyed nothing but the individual interest of J. P. Tabb as residuary devisee. The said deed was not an execution of the power, for the reason that it does not appear that it was intended as an execution of the power. It is well settled by every authority on the subject that a deed will not be construed as an execution of the power, unless it is apparent it was intended as an execution; and if it be uncertain whether it was so intended, it will not be construed as an execution. 2 Perry on Trusts, § 511 c, and cases there cited; *Blagge* v. *Miles*, 1 Sto. C. C. R. 426; 4 Kent. Com. 334–5; 2 Washb. Real Prop. 325; *Wetherill* v. *Wetherill*, 18 Pa. St. 272. Says Mr. Kent: "The general rule of construction is, that if there be an interest and a

power existing together in the same person, over the same subject, and an act be done without a particular reference to the power, it will be applied to the interest and not to the power. If there can be any legal interest on which the deed can attach, it will not execute a power." Says Mr. Perry: "If the donee of a power to sell land have also an interest in his own right in the same land, his deed of the land, making no reference to the power, will convey only his own interest; for there is a subject matter for the deed to operate upon, excluding the power, and therefore, as it does not conclusively appear that the deed was intended to be an execution of the power as well as a conveyance of the grantor's interest in the land, it will be held not to be an execution of the power." *This principle is conclusive of this case.* For the deed of July 15, 1872, by which the three tracts in Gloucester county were conveyed to George Hughes, was executed by J. P. Tabb individually, and he united his wife with him in the deed, which is an additional circumstance to show he was intending to convey his individual interest, and not under the power. He did not describe himself as executor, or in any way refer to his power under the will. He had an interest on which the deed could operate, for he was residuary devisee of the land, and owned it subject only to the annuity; and, therefore, according to the rule laid down by Kent, Perry, and the other authorities, his deed cannot be held an execution of the power, but must be confined to his own interest and passed his own interest alone. And when we look outside the deed itself, it is still clearer he did not intend to execute the power, for he took the conveyance of the New York property to himself individually, and personally assumed the payment of the mortgage on the New York property, which is strong evidence he was acting only in his own behalf.

And in addition, since the transaction was proper, if he was only affecting his own interest, but was a gross breach of trust if made by him as executor, such a construction ought to be placed upon the transaction as would make it legal, rather than one which would attribute to J. P. Tabb a departure from his power and a gross breach of trust. Nor is it a case of defective execution, which a court of equity will aid; for to call into operation this curative action of the equity court, a distinct intention to execute the power must be apparent, and no such intention appears here. *Morriss* v. *Morriss,* 33 Gratt. 79; 1 Lead'g Cas. in Eq. 375. The deed of J. P. Tabb, not being an execution of the power, conveyed his own interest as residuary devisee alone in the property, which was subject to the annuity. If any authority were needed on this point, the case of *Burwell's Adm'r* v. *Fauber,* 21 Gratt. 446, 457, is directly in point and conclusive. It therefore follows that—1st. The deed of J. P. Tabb and wife of July 15, 1872, was not an execution of the power; and 2d. That it therefore conveyed only the individual interest of J. P. Tabb to Hughes, which passed subject to the annuity.

If this conclusion is sound, it solves the case. It is evident that J. P. Tabb was only intending to sell, and Hughes to buy, the lands subject to the annuity. When he bought "White Marsh" he was careful to require the sanction of a court of equity before he would accept the title; if he had intended to get a clear title to these lands, he would have gone into court for the purpose, as he did in the case of "White Marsh." But he did not go into court because he and J. P. Tabb both well knew that no court of chancery would sanction J. P. Tabb's making such a transaction as executor.

What we have thus arrived at as the legal effect of the deed of July 15, 1872, is shown to have been the actual in-

tention of the parties by the evidence of George Hughes, in which he expressly admits that he took the three Gloucester tracts free of encumbrances, *"excepting as regards the brother's lien through the father's will,"* meaning the annuity to Philip Tabb and his children. So that it seems to us if the court should hold these tracts to be free of the annuity, it would not only violate all the authorities as to the legal effect of the deed of July 15, 1872, but would give to George Hughes, and those claiming under him, what the court sees from the sworn testimony of Hughes he never intended to buy or supposed he was acquiring, and what J. P. Tabb never intended to convey or supposed he was conveying to him. And of course if by the legal effect of the deed of 15th July, 1872, Hughes only acquired the individual interest of J. P. Tabb in the lands subject to the annuity, no person claiming under him, as Mrs. Hughes does, could claim any larger or greater interest.

LACY, J., delivered the opinion of the court.

This cause was decided by this court by a decree entered therein on the 24th of January, 1884.

On the motion of the appellees, the following order was entered herein on the 28th day of February, 1884 :

" On mature consideration of the petitions of the appellees, and of Frederick Baillen, and Evelina Mary Baillen his wife (who was Evelina Mary Tabb), to set aside the decree pronounced herein on the 24th day of January, 1884, and to grant a rehearing of this cause, it is ordered that said decree be set aside, and that a rehearing be granted, and that this cause be placed on the privilege docket."

The rehearing thus granted was general, and all the ques-

tions involved in the cause have been reargued by counsel on both sides, and upon mature consideration the court is of opinion to reverse the decrees of the circuit court of Gloucester for the reasons stated in writing and filed with record in this cause at the first hearing of the same, and to reaffirm the decree of this court entered in this cause on the said 24th day of January, 1884.

HINTON, J., dissented.

FORMER OPINION AND DECREE AFFIRMED.